IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN PAUL GOMEZ, | ) | |
| | ) | |
| Plaintiff, | ) | 2:25-cv-00605-CB |
| | ) | |
| v. | ) | Judge Cathy Bissoon |
| | ) | |
| CITY OF PITTSBURGH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

Plaintiff's Motion (Doc. 14) to withdraw his Motions at Docs. 10 & 11 will be granted, and the Motions at Docs. 10 & 11 will be denied as moot. They independently are mooted by Plaintiff's filing of an Amended Complaint. Doc. 15. Defendant's Motion (Doc. 16) to set deadlines regarding the Amended Complaint will be denied as moot, because the amended pleading since has been filed. The deadline for the already-served Defendant, the City of Pittsburgh, to answer or otherwise respond is **August 5, 2025**. *See* Fed. R. Civ. P. 15(a)(3) (allowing the Court to modify the response-period for amended pleadings). This is appropriate given the length and breadth of the allegations in the Amended Complaint, and the high demands resulting from Plaintiff's numerous filings.[1]

---

[1] The newly-named Defendants have not yet been (properly) served. Fed. R. Civ. P. 4(d), 4(j)(2); *see* 1 FED. RS. OF CIV. P., RULES & COMMENTARY § 4:73 (updated Jun. 2025) ("The Rule 4(d) procedure for requesting waiver of formal service does not apply to actions against [local] governments [and their official actors] subject to service under Rule 4(j)."); *see also* the Court's *Pro Se Filing Guide* (available at: https://www.pawd.uscourts.gov/sites/pawd/files/Pro_Se_Filing%20Guide_June_2021.pdf ("If you are suing" a "state[ or] local" government, "you cannot use [the waiver of service] method and you must arrange for Service of Process.") (capitalization and underlining in original omitted). If the new Defendants nevertheless waive service, and their positions overlap with the City's, the latter may move to

Finally, Plaintiff's "Emergency Motion for Preservation" (Doc. 19) will be denied. His allegations of "suspicious surveillance" by the Pittsburgh police are just that – allegations. The borough of Ingram is not within city-limits – and there is no legal authority for the Court to order its police to do anything under the circumstances.

Many inferential leaps are required to tie Plaintiff's June 2025 encounter to the circumstances underling this lawsuit. Among other things, they include presumptions that Plaintiff was, in fact, being surveilled; that the person he encountered was law enforcement; that law enforcement was investigating Plaintiff specifically; that it did not have an independent basis for any investigation in progress; that the presumed officer had a connection with City police; and that the officer, if he was one, knew of Plaintiff's proceedings in Pennsylvania – dating back to 2019 – through which he sought to shift the locus of his and his ex-wife's longstanding parental rights disputes from Ohio to Pennsylvania, a tactic repeatedly rejected by the Ohio courts.[2]

As with many conspiratorial musings, it is not *impossible* for all of these things to be true, just highly unlikely. Perhaps Plaintiff's concerns will abate now that he has used social media to "heighten[] public awareness" of his plight. Doc. 14 at 2. Plaintiff suffered no harm as a result

---

extend its deadline to track with that of the new Defendants. The Court will not resolve Defendants' motions to dismiss in a piecemeal fashion—and having one set of motion papers filed in advance of others will only serve to complicate the docket, and the timing and content of Plaintiff's responses.

[2] *Compare* Am. Compl. at ¶ 11 ("This case arises from a series of events beginning in 2019 involving the concealment of a weapons-related arrest [of Plaintiff's ex-wife] during the enforcement of a Protection From Abuse (PFA) order.") *with, e.g.*, Dyer v. Gomez, 2022 WL 985508, *1 (Ohio App. 7 Dist., Mar. 31, 2022) (noting that Plaintiff obtained the PFA in conjunction with his repeated protestations to continuing in Ohio (where the parties had litigated for the 14 years prior), and affirming the trial court's determination that jurisdiction remained in Ohio and venue was proper there).

of the encounter. In fact, it was he who confronted the mystery person in the first place, causing the person to become "flustered" and "abruptly fle[e] the scene." Doc. 19 at ¶ 3.

The record indicates that the City, through its counsel, has been open and cooperative with Plaintiff. There are no credible reasons to believe that the City is "out to get him" (or his son) – as a result of ancillary proceedings in 2019, made in service of his campaign to abandon the Ohio tribunal after 14 years of litigating there.

Plaintiff's filing of suit here fits a troubling, if predictable, pattern at times seen in pro se litigation, wherein a plaintiff bounces to another court once the original forum has proven unfavorable. Here, Plaintiff has exhausted nearly all avenues for relief in Ohio, including failed petitions for certiorari before the Supreme Court – and he acquired the status of a "vexatious litigant," in both state and federal court, along the way. *See* S.D. Ohio (East. Div.) Dkt. No. 2:23-cv-1058, Doc. 102 at 9-11 (summarizing nature and scope of the vexatious litigant orders, one of which is on appeal in the Sixth Circuit).

That his two children – the subjects of his twenty-year crusade in the Ohio courts – have reached the age of majority[3] seems not to have quelled his demand for redemption, regarding legal matters resolved (to his dissatisfaction) years ago.[4] His claimed standing to vindicate the rights of his adult son, through conclusory challenges to the investigations against

---

[3] *See* Dyer, 2022 WL 985508, *1 (Plaintiff's daughter was born in August 2003, and his son in March 2005).

[4] Plaintiff was not without his victories in Ohio, which one might hope would allow for self-awareness and insight. Under a fairly implemented system of justice, litigants often win some and lose some, and they should not take either too personally. Perhaps he believes that the Ohio Supreme Court was indeed "supreme" when it ruled in his favor, yet outrageously misguided when it did not. Regrettably, such expressions are commonly seen from the viewpoint of an objective and neutral judicial officer. The phenomenon appears to be part of the human condition, and it may be described as a party (or lawyer) being "too close to it" (i.e., the subject matter) to have clarity.

him, is suspect at best. As referenced above, it is not *impossible* that his son's entanglements have been affected by years-long grudges between Pennsylvania law enforcement and Plaintiff – it just seems highly unlikely (if not implausible). Given Plaintiff's advanced levels of education and intelligence, *see* Am. Compl. at ¶ 69, the Court assumes he is familiar with the principle of Occam's razor. The simplest explanation most often is the correct one. If his son's activities have raised the suspicion of law enforcement, the ensuing investigations should not only be expected, but are required to maintain a lawful and civilized society. *See generally* Am. Compl. at ¶ 45 (inferring that his son's domestic violence charges were "fabricated" because the victim declined to prosecute – a scenario so often raised, and misunderstood by non-lawyers, that its unsuccessful assertion has become cliché for courts of every jurisdiction); *and id.* at ¶¶ 66, 68 (suggesting that Plaintiff's status as lessee of the apartment he "leased and guaranteed to provide [his] son with housing stability" afforded him heightened interest regarding law enforcement's investigation of his son, a notion unsupported in the law; and alleging that the "apartment complex's refusal to renew [the] lease" was "intended to destabilize [his] son and keep him incarcerated").[5]

If Plaintiff's son has claims of unconstitutional treatment, those have been, will be or should be addressed by his counsel in the criminal proceedings. Plaintiff's attempt to drag those matters into this litigation are problematic in two central regards: the plausibility standard

---

[5] Apparently, Plaintiff's willingness towards conspiracy theory knows few bounds. Plaintiff has not named the apartment complex as a defendant, and that is a relief. The suggestion that the apartment complex knew or cared so much regarding the plights of Plaintiff and his son, frankly, land him squarely in the realm of implausible. Occam's Razor once again surfaces, and it is not hard to understand why a landlord would decline to renew a lease after the premises were the subject of a search warrant. Assuming Plaintiff explained the difficulties his son was experiencing, a normal business response would be to express sympathy, offer best wishes and gently insist that the keys be returned.

applicable under Rule 12, and standing. As to the latter point, the Ohio case cited by Plaintiff has no application here. *See* Am. Compl. at ⁋ 127 (citing Gomez v. Bennett, 181 N.E.3d 1171, 1172 & n.1 (Ohio 2021), where the court assumed without deciding that Plaintiff, as his son's biological father, arguably was "authorized under [Ohio] R.C. 2725.04 to file a [state] writ of habeas corpus to obtain [his son's] release from confinement"). The law in this Circuit runs counter. Williams v. U.S., 477 Fed. Appx. 9, 11 (3d Cir. Apr. 2012) (under binding legal precedent, a non-lawyer is forbidden from representing another non-lawyer in federal court).

The Court notes these things so that Plaintiff has reasonable expectations regarding what may be accomplished here. He cannot properly present claims to Ohio state and federal courts and, when they prove unsuccessful, seek the same relief here (or relief on the same basis). Plaintiff's pleadings openly acknowledge that facts and issues presented in this case also are before the Court of Appeals for the Sixth Circuit. Am. Compl. at 2 n.2 (the case on appeal involves claims "related to Juvenile Court proceedings concerning [his] son"; and that newly-named Defendant "Officer Anthony Moreno" is implicated in "Document 95," to which this Court lacks access, wherein Plaintiff alleges that officer Moreno engaged in "fraud and misrepresentation," presumably against the son, "carried out with deliberate indifference to [Plaintiff's] constitutional rights"). Allowing Plaintiff to pursue claims that were rejected by (or are pending before) the Ohio courts (or the Sixth Circuit Court) would amount to blatant forum-shopping. The law does not countenance "switching" courts, one after another, in the hopes of eventually landing a sympathetic ear.

Plaintiff should focus this litigation on claims that the Pennsylvania Defendants violated his civils rights – not his son's, unless he is able to identify controlling law establishing his standing. Attempts to dredge up grievances already presented to and rejected by the Ohio courts

will not be well received, or successful.  He also must have patience in the litigation process, and not declare an "emergency" any time a party does not instantly meet his requests/demands. *Compare* Doc. 10 (Plaintiff's "Emergency Motion" to compel production of an October 2019 incident report) *and* Doc. 11 (addressing the same topic, one day later) *with* Doc. 14 (Plaintiff acknowledged receiving the requested information, four days after his first motion, thereby rendering moot the "emergencies" addressed in Docs. 10 and 11).  Plaintiff should be grateful that defense counsel made a current production, because parties owe no duty to engage in discovery before the pleadings have closed.[6]

Consistent with the foregoing, Plaintiff's Motion (**Doc. 14**) to withdraw his Motions at Docs. 10 & 11 is **GRANTED**; the Motions at **Docs. 10 & 11** are **DENIED AS MOOT** (because they were withdrawn, and independently, because the Plaintiff filed his Amended Complaint); Defendant's Motion (**Doc. 16**) to set deadlines regarding the Amended Complaint is **DENIED AS MOOT**; the City's deadline to answer or otherwise respond is **August 5, 2025**; and Plaintiff's "Emergency Motion for Preservation" (**Doc. 19**) is **DENIED**.

    IT IS SO ORDERED.


July 16, 2025                                                                       s/Cathy Bissoon
                                                                          Cathy Bissoon
                                                                          United States District Judge

---

[6] Innovative Sports Mgmt. Inc. v. Hunt, 2019 WL 10366177, *2 (D. Ariz. Jun. 27, 2019) ("The Federal Rules do not require that discovery be completed before amendments to pleadings are made.").  In federal court, pre-suit discovery is limited to Fed. R. Civ. P. 27, regarding "Depositions to Perpetuate Testimony." *Id.*  This may apply when a proponent demonstrates a clear need for *testimony* and its continued availability is in serious jeopardy.  *See generally* 19th St. Baptist Church v. St. Peters Episcopal Church, 190 F.R.D. 345, 347 (E.D. Pa. 2000). At the risk of stating the obvious, this is different from Plaintiff's request to preserve privately-held video footage of an incident wherein *his* confrontation of an unidentified person caused the *unidentified person* to flee.

cc (via ECF email notification):

All Counsel of Record

John Paul Gomez (ECF-registered)